*Court of Common Pleas, Lebanon County, August 18th,* 1862.

## STEINMETZ ET AL., ADMINISTRATORS OF BECKER, *v.* WITMER ET AL.

The removal of machinery from a mill in order to give a preference to junior over senior judgment creditors is a fraud upon the latter, and will not turn the property from real into personal. The proper remedy of the older lien creditors is by ruling the proceeds of the sale into court, not by an injunction to restrain the sale.

In Pennsylvania, judgment creditors have such an interest in the property of their debtors as will entitle them to demand an injunction from a court of equity to prevent waste.

When an engine has been removed from its place in order to defraud creditors, but not taken out of the mill, the act is not so far consummated as to prevent a court of equity from granting an injunction to restrain its removal.

BY THE COURT.—The bill in this case prays for an injunction against Bender, as sheriff of Lebanon county, Witmer, the creditor, and Thoma, the debtor, in a judgment, to prevent the removal and sale of a steam-engine and other machinery connected therewith, under the following circumstances:

Henry Thoma owned a mill property and some forty acres of land in Lebanon county, on which the complainants in the bill had a lien by judgment. Witmer, in his own right and in trust for others, also had a judgment against Thoma, which was a later lien on the same property.

The saw and grist mills were in part driven by a steam-engine, the subject of the present contest, and in part by water-power. *We are satisfied from the bill, answers, and evidence,* that the mill, including the engine and other fixtures, would not bring by a sale in the market, any more, if as much, as would be required to pay the plaintiffs' judgment and the prior liens, and also that Henry Thoma has no other property of value, and is entirely insolvent. One of the judgments for three thousand dollars held

by the plaintiffs against Thoma, was entered on the 7th of April, 1860, and was due on the 1st of April, 1861. The other, for nineteen hundred and forty dollars, was entered on the 8th of May, 1861, and was due on the 1st of April, 1862. Some time prior to the 28th of November, 1861, Thoma confessed a judgment in favor of Witmer for two hundred dollars, and an execution was issued for its collection on that day. In December following, he confessed a judgment in favor of Witmer, in trust for Cyrus School, Henry Lantz, Cyrus Werner, Christian Shenk, and Witmer in his own right, and as administrator of Rosina Thoma, amounting in all to five hundred and twenty-one dollars and seventy-five cents, on which an execution issued on the 21st day of December, 1861. Both of these executions were levied on the steam-engine and articles connected therewith, after their severance from the freehold, which took place about the day the last-named execution issued, and was done under the following circumstances, as we collect from the bill, answers, and evidence. In December, 1861, Thoma resolved to suspend business with his mills, and at first had it in contemplation to take out the engine, lest it should be injured by the freezing of the water. Afterwards, on the plaintiffs refusing him any further extension on their judgments, he resolved to remove the machinery for the purpose of severing it from the freehold, so as to permit it to be levied on as personal property by Witmer on his two judgments, he desiring to prefer those creditors. Accordingly it appears that under the advice of Miley and others, Thoma caused the engine to be removed from its position, and detached it from the mill works. Lantz and Werner, two of the *cestui que trustent* of the larger judgment, assisted in the work; School, another creditor, was present; Miley sent a hand to work in place of Borgner, who refused to continue his labor. Miley was to inform Witmer when it was removed, that he might immediately levy his executions upon it, which was done, the property seized by the sheriff, and then this bill filed, and injunction prayed to prevent a sale.

On this state of facts, several questions are presented for our decision.

*First.* Was the severance of the engine and machinery under the circumstances, such an act as converted and changed it from real into personal property?

*Second.* Have the plaintiffs such an interest in the real estate, by virtue of their lien, as will enable them to prevent its waste and destruction by the owner and others, to the danger of their security?

*Third.* Is this one of the acts *contrary to law*, over which the court has equitable jurisdiction?

There can be no doubt but that the engine used for propelling the mill works was as much a portion of the real property as the

mill-house itself, and as such, was subject to the lien of the judgments against the land. The mere removal of the engine from its position, leaving it within the mill-house, if done for the purpose first contemplated by the owner, to prevent its injury from water by freezing, would not be a conversion of it into personal property, but it would remain as before, according to the principle of Gray *v.* Holdship (17 S. & R. 413), Voorhis *v.* Freeman (2 W. & S. 116), and Pyle *v.* Pennock (Idem, 390), Christian *v.* Dripps (4 Casey, 271).

There can be just as little doubt that when the fixture is severed by the owner for the purpose of converting into personal property, it becomes such, and may be sold by the owner, or levied on as personal, and sold by the officer of the law (Ross's Appeal, 9 Barr, 494), Harlan *v.* Harlan (8 Harris, 306). The only doubt that can exist in relation to the power to change the character of the property by severance, arises from the contemplated fraud on the lien creditors. Black, C. J., in the last-cited case, says, " It ought to be settled, if it is not, that such machinery may be detached by the agreement of the owners *and lien creditors,* and converted into personalty." Here is no agreement of the lien creditors, but the character of the property is attempted to be changed in manifest fraud of their rights, and for the express purpose of giving junior judgments an advantage over them. I am not, however, prepared to say that the fraudulent object would of itself be sufficient to prevent the change in the character of the property, nor is it necessary to decide the question here, for if it remains part of the realty, we can see no sufficient reason to restrain a sale by injunction. The senior judgment creditor has another more expeditious and plainer remedy, by ruling the money into court, and having it applied to his older lien. Chancery should not intervene to hinder a sale on a junior judgment. To sell is the legal right of every creditor who has a judgment, whether it be to test the right of property, or the validity of his lien. The court has no equitable jurisdiction except to prevent acts *contrary to law,* which a sale is not. It may be said to conflict with law to sell real estate in small parcels, severing one portion from another, and thus sacrificing the whole, as would be the case if a mill were torn in pieces, and the stones offered to one, the wheels to another, and the house to a third. But the party has ample remedy for such injuries by moving the court to set aside the sale, without asking equity to interfere by injunction. These proceedings should not be encouraged except when required to obtain justice. Whether the acts done do or do not amount to waste, and whether the plaintiffs in the present bill have such an interest in the property as will enable them to prevent the act through the interposition of a court of equity, will be considered in examining the second proposition.

That the act committed by the defendants is a serious injury to the plaintiffs' security, is clear beyond all question, and that it amounts to waste and destruction, is equally clear.  Whether such waste is permitted by the law, one of the defendants being the owner of the fee, and authorizing it to be done, and whether the plaintiffs stand in a situation to restrain them, are grave questions, admitting of serious doubt.  A mortgagor in possession may always be restrained from committing acts of waste which tend to impair the security (1 Dick, 75 Jeremy's Equity, 332; 2 Eden, on Injunctions, 199, note 1, also note 6, also p. 205 and note).  And a mortgagee may in like manner be restrained, and also from cutting timber or removing other articles of value, except where the security for the debt is insufficient (Jeremy's E. 332; 2 Eden, 199, and following).    Equity assumes the most extensive jurisdiction to prevent waste and destruction, and to prohibit those things which do a lasting injury to the inheritance, even against a tenant without impeachment of waste (Idem, 217 note; 1 Maddock's Ch. p. 139, 140, and 141; 2 Eden, 200, in note; 11 Reports, 80; Lewis Bowles's case, 2 Ver. 378; 1 Ves. 265; Amb. 107; 3 Atk. 215; 6 Ves. 419; 16 Ves. 375; Adams's Equity, 455).  And even to prevent trespass in extreme cases (Adams's Equity, top p. 457 and note; Maddock's Ch. Prac. 1, 147, 148, and 149; 2 Story's Eq. Jur. s. 915 to 917).

Equity interferes to prevent waste in favor of those having a remote and contingent interest, as trustees to support contingent remainders, before the contingent remainderman comes in *esse*, and even in favor of a child in *ventre sa mere* (1 Mad. Ch. Prac. 139, 40; 2 Eden on Injunctions, 200 to 212, and notes), or one holding by a contingent executory devise (Idem).   And its aid is frequently invoked by those who have no present right of action, but only on a remote contingency, and after the falling in of several intermediate estates (Eden, p. 199 to 217, and notes; 2 Story's Eq. Jur. s. 913, 917, et seq.).

And will interfere against every one who has an estate, short of a fee simple or fee tail, even against tenant in tail after possibility of issue extinct.  (See same books.)   And will not only restrain the parties themselves, but all who collude with them (11 Barb. N. Y. R. 595; Adams's Equity, 454, top p.).

In all of these cases the party applying for the injunction has some interest, although often very remote and contingent, in the land.   We are unable to find any case where a mere judgment-creditor has been allowed the writ.   That may arise from the fact that judgments are not liens in England until levied by execution. A creditor having a writ of elegit extended on land may prevent waste.   We cannot discover any case of authority in the United States where a judgment creditor has been allowed or refused the process of a court of equity to prevent waste before levy; it is

frequently given afterwards by statute, and probably exists without its aid. The case which comes nearest to it in principle is that of Camp *v.* Bates (11 Conn. 51), where it is decided that the land of an insolvent debtor, seized by attachment (the customary method of commencing actions in New England), will be protected from the commission of waste by the owner, pending the proceeding to obtain judgment. This is determined on general broad principles of equity. There, it is true, the plaintiff had a specific lien on the land, but he had no judgment, and never might obtain one, had a mere debt, or claim in suit. That case, if sound, and the reasoning is good, probably goes the whole length required to support the plaintiff's bill in the present action. It cannot be pretended that in the case of an attachment or mortgagor in possession, the owner would be restrained from cutting timber, or doing other acts usually incident to unincumbered ownership; but they will be restrained from wanton waste, or doing acts which materially tend to impair the security. Chancellor Walworth, in 1 Paige's Ch. p. 170, says: "Every person should be permitted to exercise the most liberal and extended discretion at the time and manner of disposing of his property, vesting the proceeds thereof, and collecting his debts; provided he exercises that discretion fairly and honestly, in reference to the equitable rights of his creditors, to be paid out of the same, and without any view or intention of delaying, hindering, or preventing them from obtaining their lawful dues and demands. But whenever he exceeds these limits of his legitimate authority and power over his property and funds, whenever there is reason to believe he has exercised that power with intent to delay, hinder, or defraud those who have a claim on that property, and those funds for the satisfaction of their just demands, such exercise of power becomes unconscientious and inequitable, and a court of equity will then control and regulate its exercise in such a manner as to compel him to do justice to his creditors. Such an unconscientious exercise of power by the debtor is a fraud upon the creditor."

To apply these principles to the case under consideration, we have judgments in favor of the plaintiff to a large amount against defendant, conceded to be insolvent, and the property on which those judgments are liens admitted to be insufficient for their security. We have the debtor, on being refused a further extension of time, combining with certain creditors whom he wishes to prefer, and with their aid severing a valuable portion of the real estate, with the view to render it personal, and subject it to their executions, taken out on junior judgments for the very purpose. A more palpable fraud and illegal preference could scarcely be committed, and the great question is, can this court prevent it by injunction? The difficulty in the way is the want of precedent, and the fact that a judgment is not a specific, but a general lien,

[Steinmetz et al., Administrators of Becker, *v.* Witmer et al.]

looking in contemplation of law for its security to the personal, rather than the real property, in the first instance; but when we take into consideration the almost universal practice to rely on the lien created by judgments on real estate as security for debts in Pennsylvania, and the destruction of such security where there is a stay of execution, by deciding that the creditor is helpless if the debtor should attempt to strip the land of all that is valuable, we hesitate to say that equity has no jurisdiction to prevent waste and destruction on the application of the judgment creditor. Take the case of a lot worth one hundred dollars, on which is erected a frame house worth one thousand dollars, and on the security of which the owner borrows five hundred dollars, and gives a judgment with a stay of execution for a year. Before the stay expires, the debtor commences to move off his house, and thus entirely destroys the security; must the creditor stand by and look on this destruction, and is a court of equity powerless to prevent it? All of the elementary works and judicial decisions concur in saying that the power of a court of equity to restrain waste is much more extensive than that of a court of law, by writ of estrepement, and that an injunction will be granted in very many cases, and against many persons, who would not be subject to an action of waste under the statute of Marlbridge, or a special action on the case at common law. I am strongly inclined to believe that the plaintiffs, as judgment creditors, have not that kind of interest in the premises wasted as would enable them to support an action for the waste, but it is quite possible that they might maintain an action for a conspiracy against all the parties who destroyed their security, including Miley, the adviser, who furnished a hand to assist, and gave the notice to Witmer of the time to come on with his writ to levy, Witmer himself, and the other creditors of Thoma who participated, but not including the sheriff, who only performed his duty. No writ of estrepement could be issued in this case under this statute, which only embraces judgments on which executions have issued, the land been levied on, and *condemned by an inquisition*, and subject to sale on a *venditioni exponas*. It does not even include the case of an extension, where the property is quite as much subject to that kind of injury as after a condemnation. By the act of the 8th of May, 1855, creditors having out writs of foreign attachment, either before or after judgment, may have writs of estrepement to prevent waste. It is clear that the plaintiffs have no statutory remedy, but all of the decisions agree that the remedy in equity and the power of those courts is much more extensive. I have, therefore, come to the conclusion that it embraces the present case, and that equity can prevent this act by injunction. The same doctrine must apply here that would if the stay of execution had not expired on the judgments. If equity cannot give relief in this case, where the

[Steinmetz et al., Administrators of Becker, *v.* Witmer et al.]

property is severed without the knowledge of the creditor, it cannot where his judgment is not yet ripe for execution.

It is contended, however, that as this steam-engine was placed in the mill after the judgment was entered, it is not covered by the lien thereof, and therefore could lawfully be removed. This doctrine we consider fallacious. It is well settled that fixtures placed on mortgaged premises, after the execution of the mortgage, become bound by its lien, and cannot be removed whilst the mortgage remains in force (4 Met. 306; 6 Gray, 536; 7 Gray, 241; 11 Cushing, 181). In the last-mentioned case, the mortgagee sustained an action of trespass against the mortgagor and those who assisted him in removing a house erected on the mortgaged premises after its execution.

One further difficulty remains. The engine in the present case was completely severed, although it remained on the premises bound by the judgment, before the present injunction was applied for, and it must be conceded that the remedy in equity is for the most part preventive, not corrective. When articles affixed are entirely severed from the freehold, and converted into personal property, equity will rarely restrain their sale. This especially applies to timber cut and carried to market, but from all that is stated and proved here, I consider the acts of the defendants in severing this property for the purpose stated, and in the manner proved, a fraud in law ; intended and calculated to give a later judgment creditor an advantage over an earlier one, and that all the parties defendants were participants in the fraud, and cannot take advantage of their own wrong.

The plaintiffs appear to have pursued the case so soon as they knew of the removal of the property, and have been guilty of no negligence, have not laid by whilst the rights of innocent persons had grown up and become matured, or they had expended money or labor on the machinery. We do not consider that the defendants have gained any advantage in equity by the illegal severance of the engine from the freehold.

There can be no doubt of the jurisdiction of the court on its equity side in this State. The very point is ruled by the Supreme Court, in Denny *v.* Brunson (5 Casey, 382). We are, therefore, of the opinion that the defendants must be required to replace the steam-engine and all the machinery connected therewith, within the mill-house from which it was severed, and be perpetually enjoined from selling, disturbing, or otherwise disposing of the same, and that they pay the costs of this suit.

AFFIRMED BY THE SUPREME COURT (9 Wright, 455).

*Kunkel & Simonton and Boughter, for complainants.*

*Fisher, for respondents.*